UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

19-CR-27-FPG

JAMES TIMPANARO,

SENTENCING MEMORANDUM
REDACTED

Defendant.

---

## I. INTRODUCTION

James Timpanaro is a 55 year-old veteran with a long-standing history of mental health issues and severe struggles with substance abuse. PSR ¶¶ 75 to 78, Docket No. 29. As detailed below, over his formative years, James endured unending trauma. Undoubtedly, these events dramatically shaped James' behavior ultimately playing a significant role in the underlying offense conduct. A full review of James' history and characteristics shines a spotlight upon the intense stress and mental and emotional toll that these took on James.

Despite the profound impact of his childhood traumas, James chose to enlist in the military at age 18 demonstrating his dedication and willingness to serve others. James honorably served his country and his fellow soldiers. While in the military, he admirably served fellow soldiers as a medical laboratory technician. PSR ¶ 81, Docket No. 29. Our Nation has a long tradition of according leniency to veterans in recognition of their service. *See Porter v. McCollum*, 558 US 30, 130 S Ct 447, 456 (2009). Moreover, the relevance of James' military experience is not only that he served honorably, but also that the instant offense stems from James' perceived insult for being asked for his "green card."

Veterans Administration ("VA") records attest that Mr. Timpanaro has been plagued in his daily life for the past eight years, [redacted] . *See* PSR ¶ 75 and Exhibit B, the original exhibit has been submitted under seal. There is a well-documented correlation between James' mental and emotional conditions to risk-taking behaviors and law violations culminating in the instant offense in October 2018. VA records also indicated Mr. Timpanaro was not actively engaged in treatment, or taking his medication during the months leading up to and during his participation in this crime in October 2018. As a result, James' mental health issues, especially [redacted], played a significant role in the underlying crime. Accordingly, to fully understanding James' conduct in this case, it is necessary to understand that there was an organic component impacting his behavior.

This memorandum will both explain and summarize the mitigating evidence that supports the defense recommendation that Mr. Timpanaro be sentenced to the equivalent of a low-end guideline sentence of 18 months, followed by a period of supervised release, pursuant to Title 18, United States Code, Section 3553(a)(1). As set forth below, the seriousness of James Timpanaro's offense in this case is mitigated by his long-standing mental health and substance abuse issues; his remorse over his conduct **(*see* Exhibits A)**; and his need for rehabilitation. These factors fully support the requested equivalent low-end advisory guideline sentence of 18 months, followed by a period of supervised release. Such a sentence is **more** than sufficient to fulfill the congressionally established goals of sentencing pursuant to 18 U.S.C. §3553(a).

## II. PROCEDURAL HISTORY AND ADVISORY GUIDELINE CALCULATION

On August 15, 2019, Mr. Timpanaro appeared before this Court and pled guilty to Count 1 of a two (2)-count Indictment charging that on or about October 27, 2018, he did knowingly and intentionally engage in conduct, that is, he placed a device which appeared to be a pipe bomb outside of the United States Postal Service building located at 2061 South Park Avenue, Buffalo, New York, with the intent to convey false and misleading information under circumstances where such information may reasonably have been believed, and which information indicated that an activity had taken place, was taking place, and would take place, that would constitute a violation of 18 U.S.C. § 844(f)(l), that is, an attempt to damage and destroy, by means of a fire and an explosive, any building and real property owned by, possessed by, and leased to the United States and any department and agency of the United States, all in violation of 18 U.S.C. § 1038(a)(l)(A). Mr. Timpanaro was continued in custody.

A Pre-sentence Report (hereinafter "PSR") (Docket No. 29) was prepared on October 7, 2019 and mirrors these calculations. At sentencing, the Government will move to dismiss the open counts in the Indictment pending against Mr. Timpanaro. As of the date of sentencing, Mr. Timpanaro will have served 11 months and 12 days in federal custody. *See* PSR cover page, Docket No. 29.

Sentencing in this matter is scheduled for September 25, 2019.

## III. SENTENCING PROCEDURE

In a series of cases beginning with *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment and that moving forward, the Guidelines were to be treated as "advisory." While a sentencing court must still correctly calculate the Guidelines range in each case, it may not treat that range as mandatory. *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, the Guideline range is merely "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

In rendering a sentence, a court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall*, 552 U.S. at 49-50, 53-60. A court's "overarching" duty is to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Kimbrough*; 552 U.S. at 101; *United States v. Pepper*, 131 S. Ct. 1229, 1242-43, 179 L.Ed.2d 196 (2011). These goals are retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2).

A critical Supreme Court directive designed to ensure that the Guidelines are truly advisory is the authority of this Court to disagree with a particular guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."

*Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations")); *see also Spears v. United States*, 555 U.S. 261, 266-67 (2009).

After determining the advisory Guidelines range as a "starting point" and "initial benchmark," *Gall,* 128 S. Ct. at 596, the sentencing court must then consider any applicable Guidelines departure. As it pertains to this particular case, there are several guideline departures that may otherwise be applicable. The Supreme Court in *Gall* rejected the "rigid use of a mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." 552 U.S. at 47. A "departure" is a downward adjustment to the final sentencing range specifically sanctioned by the Guidelines themselves. It is frequently triggered by a prosecutor's request to reward cooperation or by other factors that take the case "outside the heartland" of cases or defendants contemplated by the Sentencing Commission. Although the Sentencing Guidelines are now advisory, the Court in its initial guideline calculation is still required to look at permissible downward departures when calculating a sentence. *See, e.g., United States v. Galante*, 111 F.3d 1029, 1036 (2d Cir. 1997); *United States v. Ekhator*, 17 F.3d 53 (2d Cir. 1994); *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992).

One such applicable departure which the Court is directed by the Sentencing Guidelines is where mental and emotional conditions contributed substantially to the commission of the offense, based on diminished capacity. USSG § 5K2.13. The advisory guidelines also note a downward departure may be warranted based on military service, USSG § 5H1.11, as well as on mental and

emotional conditions, USSG § 5H.13, if present to an unusual degree that takes the case outside the heartland. In accordance with the Plea Agreement, the Defendant has agreed not to recommend any departure outside the Guidelines. Neither party will "advocate or recommend the application of any other Guideline, or move for any Guideline departure, or move for, or recommend a sentence outside the Guidelines." Nonetheless, the defense realizes that the Court will be considering each and every sentencing option within or without the sentencing Guidelines. The defense also realizes there are many factors the Court will consider in making its decision.

Lastly, although the plea agreement precludes Mr. Timpanaro from advocating a variance, this Court still may consider all of the 18 U.S.C. § 3553(a) factors to determine whether a variance – a sentence outside the advisory guideline system – is warranted. A "variance" occurs when a judge imposes a sentence above or below the otherwise properly calculated sentencing range based upon the application of the other statutory factors in 18 U.S.C. §3553(a). While district courts must continue to base departures on guideline factors, "many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court—with greater latitude—under section 3553(a)."

## IV. 18 U.S.C. § 3553 (a) FACTORS

As noted above, after the Court calculates the advisory Guidelines range and any grounds for a Guidelines departure are considered, the Court must ultimately impose a sentence that is consistent with 18 U.S.C. § 3553(a). 18 U.S.C. § 3553(a) mandates the court to impose a sentence that is "sufficient, but not greater than necessary" to meet the purposes of sentencing, a directive commonly referred to as the "parsimony clause." *United States v. Williams*, 475 F.3d 468, 476 (2d Cir. 2007). The parsimony clause requires a sentencing court to impose the lower of two

sentences when either of the two potential sentences would properly serve the statutory purposes of retribution, deterrence, incapacitation or rehabilitation. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). The § 3553(a) factors to be considered when imposing a sentence are as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed -
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with the needed . . . training or . . . treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for
>
> > (A) the applicable category of offenses committed by the applicable category of defendant as set forth in the Guidelines . . .;
>
> (5) any pertinent policy statement . . .[issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Under § 3553(a), the sentencing judge is permitted to find any relevant facts appropriate for determining a sentence, whether or not that sentence is within or outside the advisory Guidelines range.

For the reasons set forth below, an equivalent low-end Guideline sentence of 18 months followed by a period of Supervised Release is appropriate. Such a sentence is **more** than sufficient to serve the purposes of 18 U.S.C. § 3553(a)(2). The lowest appropriate advisory Guideline sentence would not only severely punish Mr. Timpanaro, but would also properly reflect Mr. Timpanaro's meaningful acceptance of responsibility, his honorable service to our country combined with his lifelong struggle with mental health and substance abuse issues, as well as his genuine request for continued treatment and rehabilitation. Such a sentence is more than sufficient given the nature and circumstances of Mr. Timpanaro's participation in this criminal offense; but also viewed in the context of his history and characteristics as set forth below. *See* 18 U.S.C. § 3553(a)(1). Accordingly, Mr. Timpanaro respectfully requests an equivalent low-end Guideline sentence as a sentence that is warranted based on the circumstances set forth herein in order to serve the goals of retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2).

## V. ARGUMENT

### A. THE HISTORY AND CHARACTERISTICS OF JAMES TIMPANARO

The following sections analyze the § 3553 factors against the factual backdrop of Mr. Timpanaro's case. Mr. Timpanaro recognizes the seriousness of his crime. Nevertheless, there are significant mitigating factors regarding his conduct. James was open and candid at his

presentence interview. PSR at ¶ 28. In addition, his letter to the Court is honest, reflective, and remorseful. *See* **Exhibit A**. James recounts on how his father terrorized his mother and his siblings for years. **Exhibit A** and PSR ¶ 69. In 1974, James watched in horror as his father attempted to murder his mother and then held his family hostage in a standoff with East Aurora Police. The psychological aftermath of these events are still felt today. Witnessing such sustained domestic violence led James to develop an array of negative effects [redacted] [redacted] and addition to drugs and alcohol. Research in this area has focused on the cognitive, behavioral, and emotional effects of domestic violence. Children who witness violence in the home and children who are abused may display many similar psychologic effects.[1] Another confounding factor is that James also endured extreme physical abuse at the hands of his father including being hit with belts and switches. Thus, the blueprint for Mr. Timpanaro's mental health and substance abuse issues was written years before he committed this crime.

**i. Mr. Timpanaro's Long-Standing Substance Abuse**

At the time of his arrest, James was plagued by extreme and excessive substance abuse. James has a long and well-documented history of mental health and substance abuse issues. Despite this, James knows that his substance abuse and mental health issue do not excuse his conduct. *See* **Exhibit A**, and PSR at ¶¶ 75-78. James' history spans four decades of abusing alcohol, marijuana, cocaine, cocaine base, heroin, methamphetamine, hallucinogens, and prescription medication such as Valium and Adderall. PSR ¶ 77. At the age of eight (8), James began consuming alcohol. His alcohol use fluctuated over the years, and at the peak of his

[1] Jaffe PG, Wolfe D, Wilson S, Zak L. Similarities in behavioral and social maladjustment among child victims and witnesses to family violence. Am J Orthopsychiatry. 1986;56(1):142–5.

usage, James consumed between 10 to 15 beers per day.  Clearly, alcohol also played a significant role in events of October 2018, as well as James' relapse on January 26, 2019.

By age of 15, James was smoking marijuana.  For almost forty years, James used marijuana on a daily basis.  Approximately five (5) years ago, James on his own tried to lessen his dependence on marijuana.  He was able to reduce his use to smoking the equivalent of two (2) "joints" approximately once per month.  Cocaine also had a hold on James.  At age 22, he used between a quarter and half a gram of the drug approximately three (3) or four (4) times per year with his last use in 2016.  James also revealed that he began using cocaine base at age 42. James last used crack in January 2019.  Throughout his life, James abused a litany of other drugs including: heroin, methamphetamine, hallucinogens, such as lysergic acid diethylamide (LSD) and psilocybin mushrooms, Valium, Adderall, and other opiates such as oxycodone and hydrocodone.  Today, James fully understands how he made his situation worse by using drugs and alcohol.  *See* **Exhibit A**.  While his mental health and substance abuse issues are not an excuse, it certainly contributed to his poor decision making and resorting to a bomb hoax which he now knows was not the appropriate way to express himself.  **Exhibit A**.

The impact of James' long-standing substance abuse problems on his decision-making cannot be overstated. While alcohol abuse and drug addiction has often been viewed as the result of a lack of willpower and character in the addict, experts generally agree that narcotic dependence is a form of mental illness.  *See* Nat. Instit. Of Drug Abuse, "Comorbidity: Addiction and Other Mental Illnesses" (Sept. 2010).  Addiction is "a complex brain disease characterized by compulsive, at times uncontrollable drug craving, seeking, and use despite

devastating consequences – behaviors that stem from drug-induced changes in brain structure and function." *See id.* at 1.1.

Notably, Mr. Timapanaro's struggles with alcohol and drugs did not occur in a vacuum. Indeed, James' early drug use is the expected result of an abusive and chaotic childhood James endured. ***See*** **Exhibit A**, and PSR at ¶¶ 69-74. Regardless of its genesis, Mr.Timpanaro's continued involvement in the criminal justice system and in particular this offense was based on a lack of judgment resulting from his significant daily alcohol addiction. Although such addiction does not excuse Mr. Timpanaro's culpability for his offense, it does mitigate his blameworthiness for his actions.

Finally, a lamentable, if not tragic aspect of Mr. Timpanaro's life, is that his childhood was not only impacted by his early exposure to alcohol and drugs, but also affected by his experience of neglect and abuse. *See* **Exhibit A.** James brain disease of addiction has spanned over four decades, and impaired his ability to make reasoned choices, landing him in and out of jail and culminated in his conduct in this case. Accordingly, this Court should consider the mitigating factor of addiction when selecting a sentence that is sufficient, but not greater than necessary.

**ii. Mr. Timpanaro's Long-Standing Mental Health Issues**





### B. The Need for the Sentence Imposed

In imposing just punishment to reflect the seriousness of the offense, it is important to consider that a one-size-fits-all scheme that imposes lengthy sentences indiscriminately on offenders, regardless of their culpability, does not promote respect for the law.

Furthermore, in imposing "just punishment" for an offense, a sentencing court should not disregard the additional penalties and hardships that will accompany Mr. Timpanaro while on a lengthy term of supervised release. Mr. Timpanaro will face an overwhelming number of collateral consequences. Therefore, the lowest appropriate Guideline sentence would not only substantially punish Mr. Timpanaro, but would also properly reflect Mr. Timpanaro's meaningful acceptance of responsibility, his lifelong struggle with mental health and substance abuse issues, as well as his genuine request for continued treatment and rehabilitation.

### C. The Need To Afford Adequate Deterrence to Criminal Conduct

A consideration of this factor compels an analysis of the principles of both general and specific deterrence.

#### i. General Deterrence

The principle of general deterrence is based on the absurd premise that prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home

> to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder *et al.*, *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www. brennancenter. org/publication/whatcaused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck 13 and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

(*Id.* at 1031). The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, Five Things About Deterrence (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id.*.

**ii. Specific Deterrence**

As discussed at length herein, James Timpanaro is a 55 year-old veteran with a long-statnding history of mental health issues and struggles with substance abuse. Given the circumstances set forth herein, a sentence equivalent to the low end of the sentencing advisory

guideline range of 18 months is more than sufficient to fulfill the specific deterrent considerations of the congressionally established goals of sentencing pursuant to 18 U.S.C. §3553(a).

**D. The Need To protect the Public from Further Crimes of Mr. Timpanaro**

As a preliminary matter, increasing Mr. Timpanaro's term of imprisonment will not have a positive impact on his risk of recidivism. That is, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); *see also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that 14 such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

**E. The Need To Provide Mr. Timpanaro With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner**

Clearly, James needs significant intensive substance abuse treatment, as well as mental health counseling. Notably, the requested sentence will afford Mr. Timpanaro the ability to participate in a mental health and substance abuse treatment program which will significantly

reduce his risk of recidivism. Given these circumstances, a sentence at the equivalent low-end of the sentencing advisory Guideline range of 18 months with a period of supervised release allowing him to immediately participate in the appropriate mental health and substance abuse programs is more than sufficient to fulfill the congressionally established goals of sentencing pursuant to 18 U.S.C. § 3553(a).

**F. The Kinds of Sentences Available**

Although Mr. Timpanaro may not advocate for it, this Court may vary from the advisory Guideline range. The impact of the advisory guidelines on a court's sentencing discretion has been discussed above. As recognized in *Gall,* district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49, 128 S. Ct. at 597. Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases are now potentially relevant in every case. As of November 21, 2019, James will have served almost a year in jail. A low end guideline sentence of 18 months with good time credit results in serving approximately 15 months and 16 days in custody with a portion of that remaining time being served in a half-way house.

**G. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**

There are no co-defendant's in this case. Therefore, sentencing disparity is not a specific factor in this particular case. However, counsel was able to find six other recent cases in the Western District of New York involving a hoax bomb threat where the defendants received either

a below Guideline, or low end Guideline sentence. *See* **Exhibit C.** Therefore, the requested sentence in this case is in line with sentences imposed in these cases.

**H. The Need to Provide Restitution to Any Victims of the Offense**

Pursuant to paragraph 67 of the PSR, there are two identifiable organizations in this case seeking reimbursement for emergency services in the amount of $7,498.37. PSR ¶ 67, Docket No. 29. The requested sentence will allow Mr. Timpanaro to undertake steps to pay that restitution and make these organizations whole.

## VII. CONCLUSION

Even when the Sentencing Guidelines were mandatory, sentencing courts were to treat those before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

The Supreme Court's decision in *Booker* and the command of the statute to impose a sentence that is "sufficient, but not greater than necessary," has given sentencing courts greater latitude to impose a sentence that fits the crime and the person before the court. If sentenced to an equivalent 18 months sentence, Mr. Timapanaro, he will need to comply with strict conditions of supervision to ensure that he is participating in mental health and substance abuse treatment.
As of the date of sentencing, Mr. Timpanaro will have served 11 months and 12 days in custody. The requested sentence in this case that would not be greater than necessary, to satisfy the

purposes of sentencing. In addition, such a sentence would be of such sufficient length to more than fulfill the requirements and purpose of sentencing pursuant to 18 U.S.C. § 3553(a).

**DATED:** Buffalo, New York, October 29, 2019.

Respectfully submitted,

**/s/Fonda Dawn Kubiak**
Fonda Dawn Kubiak
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341; fax 551-3346
fonda_kubiak@fd.org
*Counsel for Defendant James Timpanro*

**TO:** Joel L. Violanti
Assistant United States Attorney

Alexandra G. Piskorz
United States Probation Officer

UNITED STATES v. JAMES TIMPANARO

19-CR-27-FPG

# DEFENDANT'S EXHIBIT A

DEFENDANT'S EXHIBIT A

Your Honor;

I want to apologize to the court, to everyone present, all Americans, my children, and my ex-wife to be.

My actions were stupid, dangerous, and clearly an alarming, disruptive event to everyone involved.

There are some reasons this occurred; not good reasons, an no excuse.

My parents were both born in Buffalo. Mom was a small white woman, Carol Ann Felschow, mixed European.

Dad was Italian, Sicilian to be exact. Joe Timpanaro was lighter skinned than all 4 of us kids. He liked beating my Mom; He told me so the last time we spoke in 1985. I called him a wife-beater, he said it had been fun.

When I was 6, in 1970, we moved to the country near East Aurora. I was shocked to learn we weren't white.

While my crying sister was being called the N-word, and my older brother Joe did nothing I did what I could to stop the bullies. Yelling and pushing was all I could do, I think I was 7.

After Dad tried to shoot Mom in 1974, he held us youngest 3 kids hostage against the State Troopers.

They were divorced, and we were now the

poor Kids in East Aurora schools, with used clothes, the ones with the psycho father.

In 1980, we moved to Mom's native South Buffalo. I was now a Puerto Rican, even though I had never met one.

My Spanish nickname came in handy, drinking beer and smoking pot, running from the cops, Right behind the police station on South Park Ave, which is 4 blocks from Richfield Ave. South Buffalo has been my hometown for almost 40 years.

After High School, in 1982 I went in the Army. I wanted to be a Medical Lab Technician. Help people, not Kill them.

I worked 2½ years at Ft. Knox, Ky Blood Bank, drawing thousands of pints of blood donations, which were sent to Veterans Hospitals all over America. I Know in my heart that some of those pints of blood were used to help save a few lives. I'm proud of that.

I was honorably discharged in 1985. Eventually, my great girlfriend from Ft. Knox came to Buffalo, we had 4 Kids, got married after 2.

Our 3 beautiful daughters are pretty successful plucky South Buffalo girls who I took to dance schools, recitals, cheerleading, and just about every park and beach, museum, and tourist attraction in WNY.

Our 4th Kid, a Son, is now 19, a good Kid, Smart and tough, and I'm hoping for his best.

I took him to all the same places, camping, and coached him in Little League baseball in Lackawanna for 6 years. I treated all the kids, of all races, fairly, and taught them teamwork, good sportsmanship, and self-improvement.

I worked 10 years as a chemist in a metal plating factory, then more than 15 years as a carpenter.

Building houses, a few whiter-than-me guys called me Mexican, tried to saddle me with nicknames like Paco, or Pancho. Nothing doing, you call me Tim, or don't even speak to me.

After 9/11, I was called Arab more than a couple times.

And my personal life slowly came apart. Nightmares, insomnia, wild mood swings, increasing alcohol abuse, and poor health led me to the Veterans Hospital in Buffalo. The professionals on the 10th floor, for

[redacted]

For a few years, with medication, and lots of counseling, and group therapy, I was a lot better. People told me so, even with my somewhat regular backsliding.

And I got lazy, tried to go it alone.

No more meds, counseling, talking about problems with strangers. I'd had enough.

And I slipped, fell really, back into depression, hard drinking, was mad at everything.

I'm very sorry for what I did, it was stupid and childish. This is not an excuse, but reasons this happened. Words do hurt, and sometimes the pain lasts a lifetime.

I'm back on meds, and hopeful for my future. I exercise daily, and am in good shape for 55.

I'm going to keep seeing counselors, mental health pros, wherever I'm at, whatever it takes to stay healthy, mentally and physically. I want to meet a couple more grand kids.

And I'm not going to cause problems for my fellow Americans.

UNITED STATES v. JAMES TIMPANARO

19-CR-27-FPG

DEFENDANT'S EXHIBIT B

# REDACTED

UNITED STATES v. JAMES TIMPANARO

19-CR-27-FPG

# DEFENDANT'S EXHIBIT C

DEFENDANT'S EXHIBIT C

# Criminal Cases Report

## U.S. DISTRICT COURT -- U.S. District Court, Western District of New York
## 18 U.S.C. SECTION 1038 CASES FROM 10/22/2000 - 10/29/2019

| Case Number/ Title | Case Dates | SENTENCE IMPOSED | Notes |
|---|---|---|---|
| 1:08-cr-00225-RJA **USA v. Demitro** | *Case filed:* 08/25/2008 *Case closed:* 12/29/2008 | Deft is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 6 months; the cost of incarceration fee is waived. | *Office:* Buffalo *Presider:* Richard J. Arcara Citation: 18:1038.F FALSE INFORMATION AND HOAXES |
| 1:10-cr-00381-WMS-HKS **USA v. Fisher** | *Case filed:* 12/15/2010 *Case closed:* 09/19/2011 | The Defendant is sentenced to the custody of the BOP for a term of time served and a 1 year term of Supervised Release. | *Office:* Buffalo *Presider:* William M. Skretny *Referral:* H. Kenneth Schroeder, Jr. Citation: 18:1038.F FALSE INFORMATION AND HOAXES |
| 1:12-cr-00110-RJA **USA v. Kent** | *Case filed:* 06/25/2012 *Case closed:* 10/19/2012 | Deft is committed to the Bureau of Prisons for a term of 5 months; the Court recommends that the Deft's term of incarceration be served at the Buffalo Halfway House; the cost of incarceration fee is waived. | *Office:* Buffalo *Presider:* Richard J. Arcara Citation: 18:1038.F FALSE INFORMATION AND HOAXES |
| 6:11-cr-06193-DGL **USA v. Bassett** | *Case filed:* 01/06/2012 *Case closed:* 02/16/2012 | 24 months; 3 years supervised release; fine waived; $100 spa | *Office:* Rochester *Presider:* David G. Larimer Citation: 18:1038.F FALSE INFORMATION AND HOAXES |
| 6:13-cr-06028-DGL-MWP **USA v. Ouellette** | *Case filed:* 04/03/2013 *Case closed:* 11/04/2014 | time served; 1 year supervised release; fine waived; spa remitted | *Office:* Rochester *Presider:* David G. Larimer *Referral:* Marian W. Payson Citation: 18:1038.F FALSE INFORMATION AND HOAXES |